UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

|  |  |
|---|---|
| IN RE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER PURSUANT TO 18 U.S.C. § 2703(d) | ) ) ) ) ) ) )  Case No.: 21-MJ-5166<br><br>**Filed Under Seal** |

APPLICATION OF THE UNITED STATES
FOR AN ORDER PURSUANT TO 18 U.S.C. § 2703(d)

The United States of America, moving by and through its undersigned counsel, respectfully submits under seal this *ex parte* application for an Order pursuant to 18 U.S.C. § 2703(d). The proposed Order would require Google LLC, an electronic communications provider located in Mountain View, California, to disclose certain records and other information pertaining to the accounts: ekathy2033@gmail.com and ekathy20332@gmail.com (herein, "Target Accounts"), as described in Part I of Attachment A. The records and other information to be disclosed are described in Part II of Attachment A to the proposed Order. In support of this application, the United States asserts:

LEGAL BACKGROUND

1.  Google LLC is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15), and/or a remote computing service, as defined in 18 U.S.C. § 2711(2). Accordingly, the United States may use a court order issued under § 2703(d) to require Google LLC to disclose the items described in Part II of Attachment A. *See* 18 U.S.C. § 2703(c)(2) (Part II.A of Attachment A); 18 U.S.C. § 2703(c)(1) (Part II.B of Attachment A).

2.      This Court has jurisdiction to issue the proposed Order because it is "a court of competent jurisdiction," as defined in 18 U.S.C. § 2711.  *See* 18 U.S.C. § 2703(d).  Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated.  *See* 18 U.S.C. § 2711(3)(A)(i), (ii).

3.      A court order under § 2703(d) "shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d).  Accordingly, the next section of this application sets forth specific and articulable facts showing that there are reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation.

## THE RELEVANT FACTS

4.      The United States is investigating an online auction fraud scam concerning possible violation of, inter alia, 18 U.S.C. §§ 1343 (Wire Fraud), 1349 (Mail and Wire Fraud Conspiracy), 1956 (Money Laundering and Money Laundering Conspiracy), and 1962(d) (RICO Conspiracy).

5.      The investigation in this case has identified a criminal enterprise primarily located in Alexandria, Romania, that engages in a large-scale scheme of online auction fraud. The enterprise, referred to by law enforcement as the "Alexandria Online Auction Fraud Network" (hereinafter, the "AOAF Network"), is a wide-ranging online auction fraud and money laundering organization whose members post fake advertisements for vehicles and other items on legitimate online auction websites, lure victims into sending money for those goods, and launder

the proceeds through several layers of transactions in order to profit off of victims in the United States.

6. Law enforcement began its investigation into the AOAF Network in late 2014 when the USSS, Kentucky State Police, and United States Postal Inspection Service learned of a registered agent and organizer of two bitcoin exchange companies who was involved in an apparent, ongoing scheme involving the fraudulent, online sale of nonexistent goods. In June 2015, the investigative team executed a search warrant on the registered agent's residence and business, and the registered agent conceded his participation in the fraud scheme. He thereafter agreed to serve as a confidential source (hereinafter "CS") and began assisting the United States with its investigation into others involved in the AOAF Network.

7. The multi-year investigation has revealed a complicated scheme calculated to maximize profits for the AOAF Network, launder the proceeds of fraudulent conduct, and avoid detection from law enforcement. The fraud begins when foreign Fraudsters and their associates post advertisements on legitimate auction websites such as eBay for a variety of high-cost goods (typically vehicles) that do not actually exist. These Fraudsters and their associates would convince American victims to send money for the advertised goods by sending persuasive communications, for example, by impersonating a military member who needed to sell the advertised item before deployment or a person selling a vehicle on behalf of a deceased relative. The Fraudsters and their associates also used invoices that contained counterfeit trademarks of the online auction or sales websites to make the transactions appear legitimate. These invoices would instruct the victim on how to pay for the item and provide a false sense of security by explaining the safety measures in place to protect the buyer.

8. Once the victim agreed to the transaction, the AOAF Network engaged in a complex money laundering operation. Specifically, the Fraudsters and their associates would convince the victims to send money in various forms, including prepaid debit cards and bank wires. This money would be directed towards co-conspirators in the United States who had been tasked with laundering the payments. These domestic money launderers (hereinafter "American Processors") and their associates subsequently exchanged the victim funds into bitcoin and sent the bitcoin abroad, keeping an agreed-upon percentage for themselves. The bitcoin would be received abroad by Fraudsters, who exchanged the bitcoin into fiat currency through foreign money launderers (hereinafter, "Foreign Processors"). Specifically, Foreign Processors sent the converted proceeds to the Fraudsters and their associates, who originally deceived the American victim.

9. The targets of this investigation send and receive multiple, interstate and international wires in furtherance of the scheme, including e-mail, telephonic (including text), and other chat communications about the scheme with co-conspirators; e-mail and telephonic (including text) communications with the victims enticing them to send money; communications to American-based websites to post advertisements online; and transfers of bitcoin online. This scheme also involves numerous mailings, most notably in victims sending payment for the items advertised online through the mail and American processors sending payment amongst each other through the mail. The investigative team has personally observed the distribution and receipt of these communications.

10. This scheme also involves extensive money laundering operations, where American processors receive victim payments in various forms, such as gift card, money order, and bank deposit, convert those methods of payment into other payment types—notably bitcoin,

and transfer that money to members of the scheme outside the country that could not have redeemed the proceeds as easily and efficiently if they had received the victim method of payment directly. The investigative team has personally observed the CS communicating about or actually converting victim money to send to the foreign-based cybercriminals or foreign-based launderers.

11. There is reason to believe that obtaining information about the Target Accounts would be relevant and material to the ongoing investigation into Razvan Sandu. To date, more than twenty individuals have been indicted for their role in this scheme. Seventeen have been convicted, several are awaiting extradition and trial, and two remain fugitives. The Target Account are associated to one of the fugitives, Razvan Sandu, who was indicted in *United States v. Peter Choi*, et al, 5:19-cr-157-GFVT (sealed). On December 3, 2020, Romanian officials attempted to execute on the extradition request made by the United States, by locating and arresting SANDU, among others. SANDU was not located and, upon the submission of this request, remains at large.

### ekathy2033@gmail.com and ekathy20332@gmail.com

12. In September 2015, the CS began working and communicating with an individual using the Jabber handle, AMERICANMASSIVE. In conversations with the CS, AMERICANMASSIVE claimed to reside in Eastern Europe and described his criminal activities at length. In summary, AMERICANMASSIVE claimed he hired an independent group of individuals to post false advertisements for vehicles, recreational machinery (ATVs), and heavy equipment, at a rate of 10% of the stolen proceeds. AMERICANMASSIVE told the CS he was proficient in American-English and admitted that, at times, he personally handled the communications with the potential victims responding to the advertisements. These communications can include texts, e-mail, and, when the victim finally attempts to purchase the

5

fraudulent item, a telephonic conversation, in which AMERICANMASSIVE pretends to be an eBay representative assisting in the sale. Investigators learned that AMERICANMASSIVE is associated with Andrei Stoica, a defendant convicted in the companion case, *United States v. Andrei Stoica,* et al, 5:18-CR-81-REW. Stoica admitted to investigators that he worked extensively with IONUT RAZVAN SANDU, in furthering the portion of the online auction fraud scheme associated to AMERICANMASSIVE.

13. As part of the investigation into Rossen IOSSIFOV, a defendant convicted in the *Stoica* case for laundering the criminally derived cryptocurrency on behalf of the AOAF Network, the investigative team determined the email address ekathy2033@gmail.com communicated with IOSSIFOV over email about bitcoin the CS sent to AMERICANMASSIVE as part of the money laundering operation of the AOAF Network. Thus, ekathy2033@gmail.com is also associated to SANDU.

14. Through valid legal process, Google provided all communications connected to ekathy2033@gmail.com, including data associated with the account's usage up to February 01, 2018. Of particular interest were multiple communications between ekathy2033@gmail.com and an individual known as "Crazy Sales" utilizing the email address, cs@cleanskin.us. Translations of these emails revealed that ekathy2033 worked with Crazy Sales to create and develop a software that would allow ekathy2033 to track and process funds from his fraudulent scheme and distribute specific percentages of this money to the multiple teams working beneath him. The communications further showed that Crazy Sales successfully created the software for ekathy2033. Crazy Sales then provided the access point for this software at https://sales-tool.online/admin-login and also provided ekathy2033 with multiple usernames and passwords to utilize within the platform.

15. In 2020, the investigative team received information from another governmental entity investigating a computer program hosted on German servers that operated in a similar manner as described above. In addition to distributing payouts of victim money via bitcoin, the platform appeared to assist users by automatically creating and sending fictitious invoices directly to victims requesting payment for non-existent items. Other data sets located within the servers indicated a similar invoice distribution program was functioning but instead of requesting payment for vehicles or other specific items, payment requests were for vacation rentals which were purported to be located in Europe. The investigative team received a copy of the server data and information, which included usernames and emails granted access to the platform, bitcoin addresses receiving fraudulent proceeds of the scams, and victim contact information. The investigative team's review confirmed connections to known AOAF members. Specifically, access was provided to the aforementioned ekathy2033 email address known to be utilized by Razvan SANDU. Additional examination of this data revealed access to the servers was provided to multiple users up until at least September 23, 2019.

16. Also included within the data obtained from the process on the ekathy2033@gmail.com account, were Google records identifying ekathy20332@gmail.com as both a secondary email[1] associated with the ekathy2033 account as well as one of multiple accounts linked to ekathy2033 by cookies[2]. Among other items of information, the investigative team seeks accounts linked by cookies, communication headers, recovery e-mail addresses, or

---

[1] Google secondary emails allow users another email address with which they can access and recover the password from their primary Google account, as well as receive notifications relative to the initial Google account.

[2] Cookies are small files stored on a user's web browser directory, designed to hold information about the user and his or her device. Web servers can access cookies to enable websites to deliver webpages tailored to the particular user. Thus, when a user visits Google.com, Google sends information to the browser, which creates cookies. Every time the user returns to Google.com, the browser retrieves and sends the cookies back to Google's server. When cookies link different Google accounts, this suggests that either the same person is accessing the different accounts or different people are accessing different accounts from the same web browser on the same electronic device.

telephone numbers stored on the Target Accounts through this application. In prior search warrants and court orders obtained through valid legal process, Google provided accounts linked by cookies, recovery e-mail addresses, or telephone numbers. This yielded valuable information about the scheme, other coconspirators involved in the conspiracy, and the location and whereabouts of the account users. Obtaining information about accounts linked by cookies, recovery e-mail addresses, or telephone numbers to the Target Accounts can lead to significant developments in the investigation into the criminal schemes while also providing potential evidence and leads as the user's current location.

REQUEST FOR ORDER

17. The facts set forth in the previous section show that there are reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation. Specifically, these items will help the United States to identify and locate the individuals who are responsible for the events described above, and to determine the nature and scope of their activities. Accordingly, the United States requests that Google LLC be directed to produce all items described in Part II of Attachment A to the proposed Order.

18. The United States further requests that the Order require Google LLC not to notify any person, including the subscribers or customers of the accounts listed in Part I of Attachment A, of the existence of the Order until further order of the Court. *See* 18 U.S.C. § 2705(b). This Court has authority under 18 U.S.C. § 2705(b) to issue "an order commanding a provider of electronic communications service or remote computing service to whom a warrant, subpoena, or court order is directed, for such period as the court deems appropriate, not to notify any other person of the existence of the warrant, subpoena, or court order." *Id.* In this case, such an order

would be appropriate because the requested Order relates to an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation, and its disclosure may alert the targets to the ongoing investigation. Accordingly, there is reason to believe that notification of the existence of the requested Order will seriously jeopardize the investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, or notify confederates. *See* 18 U.S.C. § 2705(b)(2), (3), (5). Some of the evidence in this investigation is stored electronically. If alerted to the investigation, the subjects under investigation could destroy that evidence, including information saved to their personal computers.

19. The United States further requests that the Court order that this application and any resulting order be sealed until further order of the Court. As explained above, these documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

CARLTON S. SHIER, IV
UNITED STATES ATTORNEY

By:   /s/ Kathryn Anderson
      Assistant United States Attorney
      260 West Vine Street
      Lexington, KY 40507
      kathryn.anderson@usdoj.gov
      (859) 685-4885